JOHN McKEEGAN vs. DANIEL McSWINEY.

*Ex parte* McKEEGAN, *in re.* O'NEILL, *vs.* McKEWN.

Bond for $15,000, dated 4th August, 1864, and payable with interest, two years " after the blockade of the port of Charleston shall have been effectually raised." The bond was made in South Carolina, and was given for one-half the price of land sold by the obligee to the principal obligor—the other half having been paid in Confederate currency. The Court being satisfied that the intent of the parties was that payment should be made in Confederate currency, the majority *held*, reversing the Circuit decree, that the amount the obligee was entitled to recover was the value, in national currency, of the $15,000 in Confederate currency, at the date of the bond, with interest.

Moses, C. J., dissenting, *held*, that having regard to the particular circumstances of the case, substantial justice had been done by the Circuit decree, which fixed the amount of the recovery at one-half the value of the land, in lawful money, at the date of the contract, with interest thereon, and that the decree should be sustained.

BEFORE CARROLL, CH., AT CHARLESTON, NOVEMBER, 1868.

Appeals from the Circuit decree.

The case first stated, of McKeegan *vs.* McSwiney, was a bill to foreclose a mortgage of real estate given by the latter to the former, to secure the payment of a bond conditioned for the payment of $15,000 two years " after the blockade of the port of Charleston shall have been effectually raised," with interest, payably semi-annually; both instruments bearing date the 4th August, 1864.

The Rev. Patrick O'Neill, deceased, was surety in the said bond, and the case, secondly stated, was a petition for leave to prove the debt due on the bond in the case of Eliza F. O'Neill *vs.* Maria T. McKewn, and others, which was a bill to settle up the estate of the decedent.

The Master, to whom the cases had been referred, submitted a report as follows :

" On the 19th instant the following order was made : 'On hearing the solicitors in these causes, it is ordered that it be referred to the Master to take testimony and report upon the true value and

real character of the consideration of the bond at the time it was made, mentioned in the pleadings in the latter named cause, and report the amount due them.' I have taken the testimony of several witnesses, including that of the plaintiff and defendant, on the matters referred to me. I find that the property described in the mortgage was valued by several witnesses at from $5,500 to $6,000 before the war, and about $4,000 now; but no estimate is made of its real value at the date of the execution of the bond and mortgage, on the 4th of August, 1864. A paper was produced by plaintiff, containing an estimate, by William Thompson, the builder, (who is now dead,) of the cost of the buildings and of filling up the lots, amounting to $10,601.54; and the plaintiff, in his testimony, estimates the costs of the whole property to him, up to the time of the sale to McSwiney, at $12,000.

"The testimony shows that the sale of the property from John McKeegan to Daniel McSwiney was negotiated by the Rev. Patrick O'Neill, as the friend of both parties. The first terms proposed were to pay the whole purchase money in Confederate notes, but they were changed afterwards, at the instance of Rev. P. O'Neill, for the payment of fifteen thousand dollars ($15,000) in those notes, and fifteen thousand dollars in the bond of Daniel McSwiney, with the Rev. Patrick O'Neill as surety, with a mortgage of the property, as the bond and mortgage now show.

"I find that the bond bears date the 4th of August, 1864, from Daniel McSwiney and Rev. Patrick O'Neill to John McKeegan, in the penalty of thirty thousand dollars, conditioned to pay the sum of fifteen thousand dollars, at the full end and expiration of two years from and after the effectual raising of the blockade of the port of Charleston, with legal interest thereon at the rate of seven per cent. per annum from the date, payable semi-annually, until the whole amount of principal and interest due shall be fully paid and satisfied. The mortgage bears even date with the bond, and is duly recorded the 22d August, 1864, in the Register of Mesne Conveyance office, in Book Q, No. 14, page 249.

"The testimony shows that the object of the parties in extending the time of payment of the bond, in the terms of the condition, was to obtain a more settled currency than that which existed at the date of the bond.

"I have accepted the statement submitted by plaintiff's counsel of the amount apparently due on the face of the bond, $19,060.88, on the 4th instant, but this, according to the result I have arrived

at, ought to be reduced to United States Treasury notes as they compared with Confederate notes in August, 1864, which, according to the table, was $8.85 of the latter for one of the former, so the actual sum will be $8.85—$19,060.88—$2,153.77, with interest on the principal, $2,110.17, to payment.

"The plaintiff also claims to rank as a bond creditor on the estate of Father O'Neill at the time of his death.

"The defendant claims a discount of $1,250 for rents of houses due him, which the tenants had notices from the plaintiff, in 1866, not to pay over to defendant, but to himself. There is no proof that any of these rents were received by Mr. McKeegan, nor that they will be lost to Mr. McSwiney—at least they may be submitted to another tribunal—and I have not allowed the claim."

To this report exceptions were taken by McKeegan, as follows:

*First Exception.* For that the Master reports that the testimony shows that the sale was negotiated by the Rev. Patrick O'Neill, as the friend of *both parties*, whereas the fact was, and the testimony shows that he, the Rev. P. O'Neill, was the agent of Daniel McSwiney exclusively, and, as such, negotiated with the petitioner and complainant.

*Second Exception.* For that the Master reports that the change from all cash to part in a bond, was made at the instance of the said Rev. P. O'Neill, whereas the testimony shows that the petitioner and complainant insisted upon this, and the peculiar condition of the bond, as the essential condition and consideration of his contract to sell.

*Third Exception.* For that the Master has simply scaled the amount claimed to be due on the bond, without regard to anything else than the value of Confederate Treasury notes in United States Treasury notes at the date of the bond, while he, at the same time, reports that the bond was made payable as it was with a view to a better currency, which was indeed the true consideration, and he should so have reported.

On hearing the report and the exceptions thereto read, His Honor Chancellor Carroll was pleased to recommit the same to the Master, who made a second report, as follows:

"By the order of Chancellor Carroll, my report in this cause was recommitted to me to take further testimony as to the real value of the mortgaged property in lawful money at the time of the contract.

13A

" I respectfully report that, in pursuance of said order, I have had other witnesses before me, but find nothing in their testimony which enables me to fix the real value of the property in July, 1864."

CARROLL, Ch. On the part of the plaintiff and petitioner Mc-Keegan, it is contended that the Constitution and Ordinances framed and enacted in September, 1865, with the State government thereby established, and all Acts of legislation or *quasi* legislation under that authority, have passed away and become wholly inoperative. It is urged that all of these were provisional merely, and that all have been abrogated and swept away by the adoption of the present Constitution and the organization of the present State government. A different view seems to have been entertained, as well by the Convention, last assembled, as by the present legislative authority of the State. The former, by the Ordinance of 15th March last, repealed all Acts of legislation passed since the 20th December, 1860, which pledge the faith and credit of the State for the benefit of any corporate body. Of the Acts thus sought to be repealed, some of the more important seemed to have been passed during the continuance of the so-called Provisional Government of the State. The third Section of the Act of 15th September, 18 68, 14 Stat., 23, repeals in terms the eleventh Section of the Act of the General Assembly, ratified the 21st of December, 1865, entitled " An Act to raise supplies for the year commencing in October, 1865." Had the Convention last assembled, and the present General Assembly, considered those Acts of the late State Government already abrogated and inoperative, then their proceedings to repeal them was without purpose or meaning. But if any of the legislative Acts of the late State government survive the establishment of its present government, then all have survived except such as have expired by their own limitation, or are in conflict with the present Constitution of the State, or with some 'enactment of the Legislature under it.

It cannot be maintained that the Joint Resolution of the General Assembly in November, 1865, approving and ratifying the 13th Amendment of the Constitution of the United States, was in its nature temporary and provisional merely. Surely the legislative Acts of the late State government cannot have less force or permanence than would be accorded to the Acts of the General Assembly whilst the State was engaged in open war with the Government of the United States. They must be considered, at least, as having not

less force and validity than would be conceded to them by international law as legislative Acts of a conquered State. In *Mitchel* vs. *The United States,* 9 Peters, 748–9, it is said that " according to the established principles of the law of nations, the laws of a conquered or ceded country remains in force until altered by the new sovereign." " The law, usages and municipal regulations in force at the time of the conquest or cession," says Chancellor Kent, " remain in force until changed by the new sovereign."—1 Kent's Com., 178, 2, b. The provision of the fourth section of the Ordinance of September, 1865, as to suits upon certain contracts therein designated, are regarded, therefore, as still obligatory and of force. To the defence set up, the further objection is made that the provisions of the Ordinance of September, 1865, as expressed in its fourth Section, operate to impair the obligation of contracts, and being thus in conflict with the Constitution as well of the United States as of this State, are, therefore, invalid and void. It is sufficient to say that it was otherwise adjudged by the Court of Errors in the case of *Copes* ads. *Rutland,* and *Thomas* vs. *Raymond,* 15 Rich., 84.

Yet another reply to the defense is made on behalf of McKeegan. He contends that the provisions referred to of the Ordinance of September, 1865, are inapplicable to the contract between himself and the defendant, McSwiney, which he here seeks to enforce. The ground assumed on the part of McKeegan is held to be untenable, upon the authority of the decisions which have been cited.

The Ordinance of 1865, in its provisions respecting suits upon contracts made between the 1st of January, 1862, and 15th May, 1865, (as I have had occasion to remark in a case recently considered,) seems to have proceeded upon the assumption that, by reason of the extraordinary condition of the country, and the thorough derangement of all the received standards of value during the period mentioned, exactitude in ascertaining the amounts in lawful money for which men then became bound by contract, was, in the general, wholly unattainable. An approximation to the real debt, as near as practicable, and nothing more, appears to have been contemplated. In the apprehension of the Court, the true value of the consideration, at the date of the contract, should form the basis of such approximation, and then should be considered the influence and effect of the particular circumstances of the case.

The necessity of conforming to this rule seems to be manifested here by the gross injustice that would result from disregarding it.

According to the weight of the evidence, as apprehended by the Court, the true value of the property bought by McSwiney, at the date of the purchase, may be set down at·six thousand six hundred dollars. But if his bond be understood, according to his construction, as an·obligation for the payment of $15,000 in the currency of Confederate Treasury notes, or its equivalent, then McSwiney will have obtained the property for a price which, if expressed in the United States Treasury notes, would be about the half, and, if expressed in gold, would not be the one-fourth of its real value at that date. On the other hand, if, as contended by Mr. McKeegan, the bond be read as payable in gold, then he will have obtained for the property a price more than fourfold its gold value, and greatly beyond that proportion if computed in the Treasury notes of the United States at the same date. Such results seem not to have been within the contemplation of either party. It is further urged, on the part of McKeegan, that the $15,000 on account of the purchase money actually paid by McSwiney should not be treated as a satisfaction of one-half the debt, but as payment of a sum equal to the value of that amount of Confederate Treasury notes computed in lawful money. In the written contract for the purchase between McKeegan and McSwiney, represented by the Rev. Patrick O'Neill, as his agent, the price of the property, as set down, is "the full sum of thirty thousand dollars, payable as follows: One-half thereof in Confederate States Treasury notes of the last issue, and the balance in bond, bearing date this day, (4th August, 1864,) payable two years after the blockade of the port of Charleston shall have been effectually raised, with interest thereon, semi-annually, from date." The contract of purchase and sale between the parties is set forth in the bill, and in the same terms. Whatever may have been the real debt to McKeegan, incurred by ·McSwiney under this contract, it is, in the language of both, expressed by the words "thirty thousand dollars;" and it is expressly stipulated that "one-half thereof should be payable in Confederate States Treasury notes of the last issue." The one moiety of that sum, $15,000, was accordingly paid by McSwiney, and accepted by McKeegan, as and for the one-half of the purchase money.

It is not perceived how else the transaction can be regarded. The deed of conveyance recites the consideration to be $30,000, paid to John McKeegan by Daniel McSwiney. But how was such payment made? It was effected according to the terms of their

contract. One-half of that sum (the purchase money) being paid in Confederate States Treasury notes of the last issue, and the balance in McSwiney's bond. That bond and the mortgage securing it have relation to the balance, the latter moiety of the debt exclusively. It has no reference whatever to the former moiety, for so much of the debt had been already satisfied and paid. To that extent the contract, on the part of McSwiney, is regarded as executed, and the result is that his indebtedness must be set down at three thousand three hundred dollars, with interest to be computed as stipulated in the condition of the bond. (See *Austin* vs. *Kinsman*, 13 Rich. Eq., 259.)

The task of ascertaining the real debt, now due by McSwiney, might have been more satisfactorily performed through the Master, or by means of an issue at law. · It has been reluctantly assumed by the Court, and the pressure of its engagements precludes a more elaborate consideration of the case.

The Rev. Patrick O'Neill became the surety of McSwiney, on his bond to McKeegan, and has since died insolvent. The obligee and petitioner, McKeegan, appears before the Master under the order calling in the creditors of Patrick O'Neill, in the case of Elisa F. O'Neill, his administratrix, *vs.* Maria T. McKewn, administratrix, *et al.*, and claims to be paid as a bond creditor out of the assets of O'Neill's estate. It is objected, on behalf of the other creditors of Patrick O'Neill, that McKeegan should be required to exhaust his remedies against McSwiney, the principal, before resorting to the estate of his surety. It appears to be a necessary condition of the Court's interposition, in such cases, that the remedy, to which it is proposed that the creditors should resort, must be shown to be as certain, prompt and effectual as that which he is required to forego. This condition will not be disregarded if the obligee, McKeegan, is directed to seek payment of his bond primarily out of the mortgage security. All necessary parties are before the Court, and the decree of foreclosure, to be pronounced, seems to furnish him with a remedy certain, prompt and effectual for enforcing payment of his bond. It is considered that he should proceed accordingly, and not resort to the estate of Patrick O'Neill, until exhausting his remedy under the mortgage.

The blockade of a port may properly be said to be raised "whenever it is made free to ingress and egress." Such form of expression imports any determination or cessation of a blockade, whether by the appearance of superior hostile force or by the voluntary act

of the blockading power, and more upon this topic, it is appre-- hended, need not be said.

As to the exception to the Master's report, taken by the defend- ant, McSwiney, the Court concurs with what is said by the Master in his first report, " that there is no proof that any of the rents re- ferred to were received by McKeegan, or that they will be lost to McSwiney," and that exception is overruled.

Of the exceptions on the part of the plaintiff, McKeegan, a con- sideration in detail is not deemed necessary, and it will suffice to say that they are sustained or overruled to the extent herein above in- dicated.

It is ordered and adjudged, that this opinion stand for the decree of the Court.

It is further ordered and decreed, that the defendant, Daniel Mc- Swiney, pay to the plaintiff, John McKeegan, by the first day of February next, the sum of three thousand three hundred dollars, with interest to be computed according to the tenor and effect of the condition of his bond hereinabove mentioned, together with the plaintiff's costs and charges of suit, and, upon his failing so to do, that the said defendant be debarred and foreclosed of and from all equity of redemption of, in and to all and singular the several lots and parcels of land, comprised within his mortgage of the same, exhibited with the bill, and that, thereupon, the Master of this Court, or such other person as may be thereunto authorized, pro- ceed to sell the said premises, at public auction, for cash, as to one- fourth of the purchase money, and as to the residue, upon a credit of six months, with the interest from the day of sale, twenty-one days' notice of such sale, by public advertisement in one of the Charleston newspapers, to be first given, and the credit portion of the purchase money to be secured by bond with adequate securities; and that out of the proceeds of the sale the plaintiff be paid said mortgage debt, with interest to be computed as aforesaid, together with his costs of suit; and that the surplus of the said proceeds of sale, if any, be paid to the defendant, McSwiney.

And it is further ordered, that the parties severally have leave to move for such other orders as may be necessary or proper in this cause.

McKeegan, the plaintiff and petitioner, appealed from so much of the decree as allows to him only three thousand three hundred dollars, with interest, as the debt due to him under the provisions of the 4th Section of an Ordinance of the Convention, passed on

the 27th day of Septembar, 1865, entitled "An Ordinance to declare in force the Constitution and laws heretofore in force in this State, and the Acts, official, public and private, done, and appointments and elections made under authority of the same," instead of allowing the whole amount expressed in the condition of the bond, the subject-matter of these suits, with interest, or else rescinding the contract of purchase and sale altogether, upon equitable terms; and, in support of such appeal, relied upon the following grounds:

First. That the Ordinance of the Convention of September, 1865, was the act of a Provisional Government, and ceased with the extinction of the Government by which it had been adopted.

Second. That whatever rule may be enforced in relation to contracts made between the periods of time referred to in that Ordinance, such rule is not applicable in cases where the contract was not made with reference to Confederate Treasury notes.

Third. That the said Ordinance was not intended to apply, and is inapplicable to, the contract expressed in the peculiar condition of the bond, which is the subject of this suit.

Fourth. That if the said Ordinance was intended to apply, or to be applied, to such a contract, then that it is unconstitutional and void, by the provisions of the Constitution of this State then adopted by the said Convention, Article VII, Section 2; of the present Constitution, Article I, Section 21; and also of the Constitution of the United States, Article I, Section 10, Clause first; as the said Section of the said Ordinance would, if so construed, manifestly impair the obligation of this contract, so explicitly made and wholly unambiguous in its meaning and legal construction.

Fifth. That the construction given to the Ordinance that all contracts, regardless of the terms used in them, but with reference only to the date of the same, should be regarded as embraced in the provisions of the Ordinance, is against common sense and common right.

Sixth. That, by the decree in this case, the plain language of the bond was varied, without evidence of any kind, and against the just impressions of the defendant, who, when he saw the bond, understood it as an obligation to pay in good money, and relieves himself by what he says was stated to him by the Rev. P. O'Neill; and, while it is submitted that such is not competent evidence, it is further submitted that, if it was evidence of the highest kind, it would be but parol evidence, varying the terms of a contract

as expressed in writing, and concerning which there was no ambiguity.

Seventh. That, from the testimony of the defendant himself, it is plain the condition was not only susceptible of, but naturally indicated the construction for which the complainant contends; and yet, according to his own account, he made no application for any explanation to the complainant, or to his counsel, but was content to yield his own judgment in so important a matter to the statement of his own agent, and must take the consequence, and not seek to visit that misrepresentation, or misconstruction, upon the complainant, who, on his part, testifies that the same party, defendant's agent, knew that he, the complainant, understood it in the same way that defendant did at first.

Eighth. That where the parties differ as to the terms of the contract, and the Court has no mode of determining what was the intention of both parties to it, and that both understood it in the same manner, equity will restore the parties, if possible, to the condition in which they were before the contract was made.

Ninth. That, if there was any ambiguity in the words employed in the contract, it is certain, by the testimony, that the complainant then construed them as he does now, and *that* was the *consideration* he expected to receive for, and for which only he agreed to part with, his property; and it is equally certain that defendant perceived that they would bear that meaning, and the most that equity can do for the defendant is to rescind the contract, and restore him, as far as possible, to his position before the contract, that is, as was proposed by the complainant, that the defendant should be decreed to reconvey the premises, and take back the value of the Confederate Treasury notes paid by him, upon such terms, as to rents, on the one hand, and interest on the other, as may seem just.

Tenth. That there is nothing in the contract or in the facts admitted, or in the testimony in the cause, to warrant His Honor's conclusion that the complainant received half of the consideration for which he sold his property; but, on the contrary, his testimony that he considered the cash paid in Confederate currency as nothing, and looked principally to his bond as the real consideration, is wholly uncontradicted, and is corroborated and sustained by the circumstances of the time when the contract was made.

Eleventh. That to bind the complainant to the estimate of other people for his property, and to refuse to estimate the value of the

part payment in the same way, is unfair and unequal, and ought not to be sustained in equity ; and, in fact, is inconsistent with the Ordinance itself, which puts the whole consideration upon both sides upon inquiry.

Twelfth. That the precise terms of the condition of the bond conclusively show that the complainant parted with his property, and the defendant purchased it upon their respective estimates of the effects of a future contingency distinctly contemplated by both, and their bargain thus made with the eyes of both of them fully open ought not to be interfered with.

Thirteenth. That under all the circumstances of this contract, the complainant is entitled to have the benefit of the highest value which can be set upon it by honest men, and two such witnesses have valued the property from $8,500 up to $9,000, and the Chancellor should have estimated it at $9,000, at least at $8,500, and the decree should be modified accordingly.

The defendant, McSwiney, also appealed, for the causes and upon the grounds as follows :

1st. That the Chancellor erred in overruling his exceptions to the Master's report.

2nd. That the Master's calculation of the value of complainant's claim ought to have been sustained ; and it was error to change the same.

*McCrady*, for McKeegan.

*Phillips, Campbell*, for McSwiney.

Nov. 26, 1870. The opinion of the Court was delivered by

WILLARD, A. J. The first of the above entitled cases is a bill to foreclose a mortgage of land. The second is a petition on the part of the mortgagee, intervening in the case of O'Neill *vs.* McKewn, in order to make the amount of the bond which the mortgage was given to secure, and to which P. O'Neill, deceased, was surety, a charge upon the estate of said P. O'Neill, the settlement of which estate is involved in the last named suit. The cases were heard and decided together; and, as they depend upon the same questions, they will be here considered together.

The bond and mortgage in suit were made August 4, 1864. The contract of sale called for the payment of $30,000, as follows: One-half thereof in Confederate States Treasury notes of the then last issue, and the balance in a bond bearing date August 4, 1864,

payable in two years after the blockade of the port of Charleston shall have been effectually raised, with interest thereon, semi-annually, from date, to be secured by a good surety to the bond, and also a mortgage, &c. The first payment was made as called for by the agreement, and the bond and mortgage in suit given, following the terms of the contract. The principal question raised by the bill and answer was, whether the parties intended the bond as payable in Confederate currency, or in such medium as should be lawful money at the maturity of the bond.

Testimony was taken before a Master, and his report made, by which it was held that the bond called for the payment of Confederate money, according to the true intent and understanding of the parties. The Master converted the sum called for in the bond into United States money as of the date of the bond, and reported the amount due according to such basis of calculation.

Upon the hearing before the Chancellor, the conclusion of the Master, so far as it related to the character of the currency which the parties had in view, was sustained, but a different view taken of the mode of arriving at the amount due upon the bond from that adopted by the Master. The basis adopted by the Chancellor was the value of the property mortgaged at the time of the sale, as ascertained by testimony.

We have already held, in *Neely* vs. *McFadden*, decided at this Term, (ante, p. 169,) that it was competent to look into the real intent of the parties as to the medium of discharging the obligation of the bond by the aid of extrinsic evidence.

The conclusions of the Master and of the Chancellor, as to their intent, in this respect, rest in part on the contract of sale and in part on parol proofs. The question is one of fact, and we find no sufficient ground for disturbing their conclusions in this respect.

As it regards the other point, what was held in *Neely* vs. *McFadden*, and in *Harmon* vs. *Wallace*, following that case, fully dispose of the present question. The basis adopted by the Master was substantially correct, while that adopted by the Chancellor is not, in our judgment, conformable with the contract of the parties.

Neither party having excepted to that part of the Master's report that sets forth the relative value of Confederate currency and lawful money of the United States at the date of the contract, they are not entitled to call it in question at the present time; nor have they alluded to that subject in their grounds of appeal.

The decree of the Chancellor might be allowed to stand, after

being modified as to the amount due upon the bond and mortgage, but for the fact that it may be found desirable that the terms of sale as stated by the Chancellor should be modified ; and, also, for the fact that the decree, as it regards the petition of McKeegan, is interlocutory, and calls for further action in the suit in which such petition was filed.

The Circuit decree will, therefore, be reversed, and the report of the Master confirmed, and the cause will be remitted to the Circuit Court for a decree and further proceedings on the Master's report, upon the principles here laid down.

*Wright*, A. J., concurred.

MOSES, C. J., dissenting. In the opinion of the Court, it is assumed that the Master, in his report, " held that the bond called for the payment of Confederate money, according to the true intent and understanding of the parties."

It is further assumed, that the said report, so far as it relates to the character of the currency which the parties had in view, was sanctioned by the Chancellor. Regarding this as an established fact, the Court applies to the case the rule it adopted in *Harmon* vs. *Wallace.*

The opinion of the Court thus gives effect to a question of fact as concurred in both by the Chancellor and Master. With proper deference, I submit that there is nothing in the decree of the Chancellor to sustain the conclusion.

The Master did reduce the amount apparently due on the bond to the value of national currency, as compared with Confederate Treasury notes at its date ; and if this act was to intimate his judgment as to the intention of the parties in regard to the character of money through which the payment was to be made, the effect is entirely destroyed by his statement, in this respect, " that the testimony shows that the object of the parties, in extending the time of payment of the bond in the terms of the condition, was to obtain a more settled currency than that which existed at the date of the bond."

So far from adopting this report, the Chancellor recommitted it to the Master, who, on 24th October, 1868, reported " that, in pursuance of said order, he had other witnesses brought before him, but found nothing in their testimony which enabled him to fix the real value of the property in July, 1864." It obviously appears that the object of the Chancellor, in the remittal, was to ascertain

the value of the premises at the time of the execution of the agreement.

The decree, not holding that the character of the currency, which the parties had "in view," was that which the Master adopted, is based upon an entire repudiation of his conclusion, and establishes the amount of the debt by reference to all the facts presented by the testimony "showing the true value and consideration of the bond at the time it was made." This constituted, too, the very matter of inquiry submitted to the Master by the first order of reference.

We are, therefore, free from the effect of a concurrence between the Chancellor and Master on a question of fact, which is usually held conclusive on this Court.

I propose, now, to present my views of the case before us.

On the fourth of August, 1864, an agreement, in writing, was entered into between John McKeegan, the plaintiff and petitioner, and the Rev. Patrick O'Neill on behalf of Daniel McSwiney, the defendant, for the sale and purchase of certain real estate in the city of Charleston.

By its terms, as alleged in the bill, the price was fixed at $30,-000, one-half thereof to be paid in Confederate notes of the last issue, and the balance to be secured by the bond of the defendant with a good surety, "payable two years after the blockade of the port of Charleston shall have been effectually raised, with interest thereon, semi-annually, with a mortgage of the premises." The agreement was carried into effect by the payment of the $15,000 in Confederate Treasury notes, and the execution of the title, bond and mortgage, the Rev. P. O'Neill (since deceased) having signed the bond as surety.

The bill was filed for foreclosure of the mortgage, and the material question before the Court involved the value of the obligation to the plaintiff, and this depended on the amount which he had a right to exact for its payment.

While, on the one hand, he avers and contends by his bill that he is entitled to the whole sum, in such money as was current when the bond fell due, the defendant, on the other, denies that his liability can be extended beyond the value of Confederate notes converted into national currency at its date.

The grounds of appeal which question the constitutionality of the Ordinance, and its applicability to this contract, are disposed of by the decision of the Court of Errors, in December, 1867, in *Rut-*

*land* vs. *Copes et al.,* and *Thomas* vs. *Raymond,* 15 Rich., 84 ; the last named case will be more particularly noticed hereafter.

Nor is it necessary to consider whether a proper construction of the Ordinance requires that regard is to be had to the real consideration of the contract as its value, or that this is to be estimated by the worth of the obligation. In either view, the purpose proposed is accomplished. Without violating or impairing the obligation of the contract, it seeks to attain its true intent, as understood between the parties, and to give it that effect which was designed to attach to it by those who best knew its import, and were to be mutually affected by it.

The issue between the parties is as 'to the amount for which the defendant is to be held liable on the bond for $15,000. Is he to be held to its payment in specie, or the present prevailing currency ? or, is he entitled to any abatement by reason of the true value and real character of the consideration of the contract at the time it was made, and the particular circumstances which attended its inception, and, if so, to what extent?

In the written contract for the purchase, the price, as set down, is, " the full sum of $30,000, one half thereof in Confederate Treasury notes, of the last issue, and the balance in his bond, bearing date this day (4th August, 1864,) payable two years after the blockade of the port of Charleston shall have been effectually raised, with interest thereon, semi-annually, from date."

The language of the agreement would seem to imply a conviction, on the minds of the contracting parties, that when the blockade should be effectually raised, it would be through the success of the Confederate arms, and that the circulating medium, prevailing at the time of the agreement, would continue to be the currency in use in the State, whether increased or diminished in value it was not easy to predict.

They must have had, too, each for himself, some standard by which the value of the property was to be measured. According to the conclusion of the Chancellor, its " true value, at the date of the purchase, may be set down at $6,600," and it would be difficult to conceive of any view which the seller could have taken to enhance it to the amount he now requires, or what consideration could have urged the purchaser to depreciate it, as he now claims.

The sum fixed being so exorbitantly above its value in gold, we are obliged to assume that the price at which it was rated was not measured by that standard. One-half of the purchase money

was paid in Confederate Treasury notes, "and the balance was to be paid two years after the blockade of the port of Charleston shall have been effectually raised, with interest," &c. To confine the plaintiff to the value of Confederate money, as of August, 1864, would not comport with his intention, evident on the face of the contract, not to sell the property at $30,000 in that currency. To hold the defendant to the payment of $15,000, either in specie or United States currency, as the one-half of the value of the property, when, in the language of the agreement, $15,000 in Confederate money was to be received as payment of one-half of the stipulated price, would so clearly violate what appears to have been the manifest intention of both of them, that the conclusion need only to be seen to be discarded.

This view disposes of the point made in the tenth ground of appeal, which resists the conclusion of the Chancellor that the plaintiff received half of the consideration for which he sold the premises.

It is not necessary to enquire how far the defendant would be bound by any promise or undertaking of the late Rev. Mr. O'Neill, as his agent or attorney. This would depend on the extent of the power and authority conferred. These have not been shown.

It is true that where, as in this case, parol testimony is admitted for the purpose of affording aid in arriving at the intention of the parties, all that was said by either, brought home to the other, no matter through what medium, would be heard and considered as bearing on the result.

It is not alleged or proved that the defendant understood that the balance of the purchase money was to be paid in specie. Mr. McKeegan, in his testimony, no where states that he expressed, even to Mr. O'Neill, his purpose that it was to be paid in specie. It is true, he says in his bill, that he averred to Mr. O'Neill such purpose. It appears, however, from his testimony, (before the Master,) that Mr. O'Neill understood, at first, that the transaction was to be closed by the payment of the whole price in Confederate notes, for he says : " Father O'Neill went off and brought a title drawn ;" he, (witness,) examined the title, carried it back to him, and said to him : "I did not intend to sell my property, in that way, and will not sell it." " Some time after he called on me again, and for some time after followed me up about selling him the property. At length, I told him the only way I would sell this property would be in this way : you pay me $30,000, one-half in Confederate money, new issue, and the

other half two years after the effectual raising of the blockade of the port of Charleston." He said, " if you sell in that way, you will get more for it than if you put it in market after the war is over." " The understanding between Father O'Neill and myself, in making the trade, was that, at the time when the bond became due, there would be a settled currency of some kind or another, and that I should be paid something towards what the property was worth, as the money I was getting was worth nothing. It was perfectly understood betwixt Father O'Neill and myself," as he (witness) now expresses it, " and made in good faith."

Taking this as a whole, it does not impress the mind with the conviction that Father O'Neill looked to the bond as one on which specie was of right to be claimed.

This case cannot be distinguished from that of *Thomas* vs. *Raymond*, above referred to. There the plaintiff, in August, 1863, sold a house and lot in the town of Greenville to the defendant, Mary Raymond, for the sum of $7,000, payable six months after the ratification of peace with the United States, or before, at his option, with interest, payable annually. To secure the payment, the defendant gave her sealed note, and also a mortgage of the premises. In May, 1866, the bill for foreclosure was filed. The defendant submitted that the note was subject to the Ordinance of the Convention of the 27th September, 1865, which the plaintiff resisted: First, because the provisions of the Ordinance were not applicable to this particular transaction, as, from the terms of the note, it was apparent that it was the intention of the parties that it should be paid in good money, or that the plaintiff should have the right to wait until six months after the termination of the war, and demand such currency as might be in use at the time. Secondly, because the Ordinance violated the Constitution of the United States, as impairing the obligation of a contract. Both objections were overruled by the Chancellor, who referred the case to the Commissioner, to inquire and report what was the value of the premises on the 25th of August, 1863. After fully and minutely examining and considering all the testimony reported, he decreed that the sum due on the note was $2,500, the value of the property on the day of sale. On appeal, his judgment was sustained by the Court of Errors.

I do not desire to be understood, in citing this case, as holding the Chancellor restricted, in his inquiry as to " the true value and real character of the consideration," to the value of the property

at the day of sale. He is to look to "the particular circumstances" of the case, "and effect substantial justice," so far as it is within human ability and power to do so.

The evidence touching the value of the property before the war, at the time of the contract, and since the war, was brought to the notice of the Chancellor on Circuit, and was fully heard and considered by him. On a question of fact, his judgment should not be interfered with, unless manifest error is made to appear, or the testimony so preponderates against his conclusion that a dissent from it would be compelled.

In my view, the reversal of the Chancellor's decree, for the reasons assigned, is not in conformity with equity or justice.